IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


NATIONAL ASSOCIATION FOR THE  )
ADVANCEMENT OF COLORED PEOPLE,)
ET AL.,                       )
                Plaintiffs,   )
        v.                    )     CIVIL NO. 4:86CV00291
                              )
CITY OF THOMASVILLE, NORTH    )
CAROLINA; CITY COUNCIL OF     )
THOMASVILLE, NORTH CAROLINA,  )
ET AL.,                       )
                Defendants.   )


MEMORANDUM OPINION

BULLOCK, District Judge


        This case is before the court on Defendants' motion for

relief from judgment pursuant to Rule 60(b), Federal Rules of

Civil Procedure, filed on December 4, 2004.  The parties agree

that the record contains all of the information necessary for the

court to decide Defendants' motion, including voter registration

data, election return results, demographic data, and analysis by

an expert, Dr. Orville Vernon Burton, retained by the Plaintiffs.

Defendants do not dispute Dr. Burton's expertise or that his

analytical method is the best evidence available of minority and

majority voting in the City of Thomasville's elections since

1987.  While the parties do not question the accuracy of the

statistical evidence of election results, registration, and

racial identification, they differ as to the inferences that should be drawn from such data.

In making its findings and reaching its conclusions, the court has utilized the standards for considering modification of institutional reform decrees set out in <u>Rufo v. Inmates of the Suffolk County Jail</u>, 502 U.S. 367 (1992), and in determining whether any modification of the 1987 consent judgment prohibiting voting practices which previously resulted in a denial or abridgment of the rights of citizens to vote on account of their color is suitably tailored to protect those rights consistent with the provisions of the Voting Rights Act of 1965, as amended, the court has applied the standards set out in <u>Thornburg v. Gingles</u>, 478 U.S. 30 (1986). Having considered these standards, the evidence in the record, the briefs filed with the courts, and the arguments of counsel on March 23, 2005, and August 4, 2005, the court makes the following findings of fact and conclusions of law.

FINDINGS OF FACT

1. On March 31, 1986, Plaintiffs, two black citizens and registered voters of the City of Thomasville, North Carolina, and the National Association for the Advancement of Colored People

2

(NAACP) by its Thomasville Branch, brought an action challenging the form and method of election of council members to the City Council of the City of Thomasville.

2. In 1986, the Thomasville City Council consisted of the mayor and five council members, all of whom were elected citywide to staggered terms. Four of the five council members were required to reside in "wards," but they were voted on by all voters of the City. The effect of the ward residency requirement was to make each seat a separate election.

3. Plaintiffs claimed that the at-large method of election had the purpose and/or effect of diluting minority voting strength in violation of their rights under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1971, 1973, et seq., 42 U.S.C. § 1981, and 42 U.S.C. § 1983, as well as the Fourteenth and Fifteenth Amendments to the United States Constitution.

4. On March 18, 1987, this court entered a consent judgment finding that the then-current at-large election procedure violated Section 2 of the Voting Rights Act in that it had the effect of preventing black voters from having a fair opportunity to elect candidates of their choice.

5. With the consent of the parties the court ordered that Thomasville amend its charter to expand the council to eight members (mayor and seven council members); to have two council

3

members elected from the City at large every two years, and to have the five other members elected from wards by the voters of those wards only, for four-year staggered terms.

6. One of the wards established pursuant to the 1987 judgment, Ward 3, was drawn to have a majority of black voters.

7. On April 15, 2003, the voters of the City of Thomasville approved referendum propositions changing the length of the terms so that all seven council members would have a two-year term, and changing the method of election to an at-large election system in which all of the candidates would be voted on at the same time, in a non-partisan, plurality election, with no ward residency requirements. On July 10, 2003, Defendants completed action on charter amendments implementing the changes.

8. On August 28, 2003, Plaintiffs filed a motion for a preliminary injunction seeking to prohibit the Defendants from conducting elections for mayor and members of the City Council of the City of Thomasville by any method and under any system other than that provided in the consent judgment entered by the court on March 18, 1987. Following a hearing, the court granted the preliminary injunction on October 10, 2003.

9. On November 20, 2003, counsel for the Plaintiffs and for the Defendants filed a report to the court advising the court that the parties desired that an election proceed as soon as possible using the five-ward, two-at-large method provided in the

4

consent judgment entered by the court on March 18, 1987. The parties agreed that the wards would be those adopted by the Thomasville City Council on February 8, 2003, as a result of two recent annexations and the 2000 decennial census.

10. On November 24, 2003, the Defendant City of Thomasville notified the court, and confirmed in a supplementary report on November 28, 2003, that the State Board of Elections, upon the request of the City, had scheduled an election using the five-ward, two-at-large method of election for February 3, 2004. As result of the agreement by the parties, Plaintiffs asked the court to dissolve the injunction and allow the deferred 2003 election to proceed as scheduled by the State Board of Elections.

11. By order entered December 2, 2003, the court dissolved the injunction entered on October 10, 2003, allowing an election using the five-ward, two-at-large method to go forward.

12. The postponed 2003 election was held on February 3, 2004, using the five-ward, two-at-large method of election required by the 1987 consent decree.

13. On December 6, 2004, Defendants filed a motion for relief from judgment pursuant to Rule 60(b), Federal Rules of Civil Procedure, asking the court to terminate its 1987 judgment and to accept the new election method approved in the City's 2003 referendum.

5

14.  The City's new election plan would change the current election system of five single-member electoral wards and two members elected at large to a system in which seven members would be elected at large every two years in non-partisan, plurality elections, eliminating the staggered terms and residency requirements.

15.  According to the 2000 census the City of Thomasville had a total population of 19,788.  Of that total 13,799 (68.6%) persons were white only and 4,731 (23.9%) were black only. Thomasville's voting-age population was 14,737, of whom 10,689 (72%) were white only, and 3,263 (22%) were black only.  Persons who identified themselves as black comprised 24.4% of the total population and 22.28% of the voting age population.

16.  The population of the City has increased since 1987 because of annexation.  According to the Davidson County Elections Board, the number of registered voters has increased from 7,611 in 1987, 24.99% of whom were black, to 13,468 in January 2004, 20.05% of whom were black.

17.  There have been five elections for the Ward 3 seat since 1987, and each time an African American has been elected. Only once has the seat been contested by a white candidate.  The parties agree that the candidate elected to the Ward 3 seat each time has been the candidate of choice of black voters.

6

18.  Elections for the two at-large seats on the City Council provide the best available evidence as to whether the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidates.

19.  The Plaintiffs' expert analyzed Thomasville City elections from 1987 through 2004 using bivariate ecological regression analysis.  For each at-large election, with the exception of the 1995 election for which the necessary data was not available, Dr. Burton determined which candidates were the candidates of choice of black voters.  Because two seats were up in each at-large election Dr. Burton had to determine whether there were two candidates who were the candidates of choice of black voters or whether only one candidate had that level of support.  In doing so Dr. Burton considered whether the candidate second-most favored by black voters had at least two-thirds (2/3) of the support of the most favored candidate.  If the second candidate had that level of support he or she would be considered a second candidate of choice, but if the support was below that level the candidate would not be considered a candidate of choice.

20.  Based on Dr. Burton's analysis of the 1987 election for the two at-large seats black voters' candidates of choice were, first, Burton, and, second, Brooks.  Both candidates were African American.  Burton was not elected, Brooks was elected.

7

21.  Based on Dr. Burton's analysis of the 1989 election for the two at-large seats black voters had only one candidate of choice, Brooks, who was African American.  Brooks was elected.

22.  Based on Dr. Burton's analysis of the 1991 election for the two at-large seats black voters' candidates of choice were first, Stukes, and second, Reece.  Stukes was African American, Reece was white.  Stukes was not elected, Reece was elected.

23.  Based on Dr. Burton's analysis of the 1993 election for the two at-large seats, black voters' candidates of choice were first, McDowell, and second, Dinkin.  Both were white; there were no African American candidates for the at-large seats.  Both McDowell and Dinkin were elected.

24.  No analysis was made of the 1995 election because of the absence of the necessary data.

25.  Based on Dr. Burton's analysis of the 1997 election for the two at-large seats, black voters had only one candidate of choice, Hammond, who was African American.  Hammond was elected.

26.  Based on Dr. Burton's analysis of the 1999 election for the two at-large seats, black voters' candidates of choice were first, Hammond, and second, Bennett.  Hammond was African American, Bennett was white.  Hammond was not elected, Bennett was elected.

27.  Based on Dr. Burton's analysis of the 2001 election for the two at-large seats, black voters' only candidate of choice

8

was Bennett. Bennett was white. There were no African American candidates. Bennett was elected.

28. The 2003 election was postponed because of this litigation and was not held until February 2004. Based on Dr. Burton's analysis of the 2004 election for the two at-large seats, black voters' candidates of choice were first, White and second, Harrison. Both were African American. Neither was elected.

29. Since 1987 there have been eight elections and sixteen opportunities for candidates to be elected to the at-large City Council seats in Thomasville (excluding 1995). Based on Dr. Burton's analysis, eight of the thirteen identifiable candidates of choice of black voters won at-large seats on the Thomasville City Council between 1987 and 2004. The candidate of choice with the highest support among black voters won in four of eight elections. When a second candidate of choice was identified using the 2/3 rule, that candidate won in four of five elections. In four of the eight elections every candidate of choice of black voters was elected--the only candidate of choice in 1989, both candidates of choice in 1993, and the only candidate of choice in 1997 and 2001. When the candidate of choice of black voters was black, the candidate won three of eight times. The identifiable candidate of choice of white voters won eleven of fourteen times.

30.  In the six elections in which a black candidate ran, the black candidate would have been elected on one occasion if only white voters had cast ballots.

31.  In the eight elections since 1987 (excluding 1995) black and white voters have had the same candidates of choice for one of the two seats on four occasions, applying the 2/3 rule.

32.  Before 1987 no African American won an election for any of the City Council seats in Thomasville.

33.  Defendants do not contest that African Americans as a group remain sufficiently large and geographically compact to constitute a majority in a single-member electoral district.

34.  African Americans as a group are politically cohesive.

35.  Based on Dr. Burton's analysis voting in Thomasville remains racially polarized, with white voters generally not voting for black candidates, and black voters voting as a bloc for black candidates.

36.  African Americans in Thomasville generally have less education, lower incomes, less access to transportation, higher unemployment, and other disadvantages in comparison with whites.

37.  In the April 15, 2003, referendum on changing the method of electing the City Council pursuant to a petition submitted by voters under authority of North Carolina General Statute Section 160A-104, most African Americans casting ballots voted against the proposed change of the method of election of

10

the City Council to a completely at-large system.  Many black
voters did not go to the polls because of the belief that the
petition would not be approved anyway.

38.  Implementation of the changes approved by the voters in
the April 2003 referendum will mean that the Thomasville City
Council will consist of seven members elected concurrently every
two years in at-large, non-partisan, plurality elections.  The
mayor will continue to be elected separately.

39.  The proposed at-large election method is significantly
different from the method in effect before 1987.  Black voters'
ability to elect candidates is enhanced by the elimination of
staggered terms and residency districts so that candidates for
all seven seats run together in non-partisan, plurality elections
for two-year terms, allowing the use of "single-shot" or "bullet"
voting (refraining from casting all seven votes in order to avoid
the risk of giving lower-ranked candidates enough votes to defeat
higher-ranked choices).


DISCUSSION


I.

The City's motion pursuant to Rule 60(b), Federal Rules of
Civil Procedure, seeking relief from the consent judgment entered
in this case on March 18, 1987, cites the specific language of

11

Rule 60(b)(5) and Rule 60(b)(6) in support of the motion.
Rule 60(b)(5) provides that the court may relieve a party from a
final judgment for the reason that "it is no longer equitable
that the judgment should have prospective application."
Rule 60(b)(6) provides that the court may relieve a party from a
final judgment for "any other reason justifying relief from the
operation of the judgment."  Relief cannot be granted under
Rule 60(b)(6) if it is available under the first five provisions
of Rule 60(b).[1]  Because it appears that the facts upon which the
City relies fit plainly in Rule 60(b)(5)--"it is no longer
equitable that the judgment should have prospective
application"--the court will analyze the City's motion under this
standard.

    The consent judgment entered in this case in 1987 is
properly viewed as an "institutional reform" consent decree under
the standards of Rufo v. Inmates of the Suffolk County Jail, 502
U.S. 367 (1992).  In that case the Supreme Court recognized that
a flexible approach is often essential to achieving the goals of
reform litigation, and that a party seeking modification of an
institutional reform-type judgment should first bear the burden
of establishing that a significant change in facts or law warrant
revision of the decree or that enforcement of the decree would be
detrimental to the public interest.  Once the moving party has

---

[1]See 11 Charles Alan Wright, Arthur R. Miller & Mary Kay
Kane, Federal Practice and Procedure:  Civil § 2864 (2d ed.
1995).

met its burden, the district court must then determine whether the proposed modification is suitably tailored to the changed circumstances. Id. at 391. If the court determines that "it is no longer equitable that the judgment should have prospective application" the court may modify a final judgment, including those entered by consent. See Thompson v. U.S. Dep't Hous. & Urban Dev., 404 F.3d 821 (4th Cir. 2005).

The judgment entered in this case in 1987 was intended to be remedial in nature and should not remain in effect longer than necessary to serve the purpose of providing African-American citizens an equal opportunity to elect candidates of their choice in Thomasville City elections. It is in the public interest to return control over elections to local authorities unless doing so would interfere with the voting rights of minority citizens as protected by the Voting Rights Act. While Plaintiffs dispute whether or not the City's motion is timely, Rule 60(b)(5) requires only that the motion be made in a reasonable time.

The court cannot find that the City has unreasonably delayed in bringing this motion or that the Plaintiffs have been unfairly prejudiced by any alleged delay. On April 15, 2003, the voters of the City of Thomasville approved the referendum proposition providing for an at-large election system in which all of the council candidates would be voted on at the same time for two-year terms. On July 10, 2003, the City completed action on charter amendments implementing the changes. Because the City sought to implement the changes prematurely and without court

13

permission, this court granted a preliminary injunction on
October 10, 2003, prohibiting the City from conducting elections
for mayor and members of the City Council by any method and under
any system other than that provided in the March 18, 1987,
consent judgment. On December 2, 2003, the court dissolved the
injunction upon agreement by the parties. The postponed 2003
election was held on February 3, 2004, using the five-ward,
two-at-large method of election required by the 1987 consent
judgment. Thereafter, on December 6, 2004, Defendant filed this
motion seeking relief from judgment pursuant to Rule 60(b),
asking the court to terminate its 1987 judgment and to accept the
new election method approved by the City in the 2003 referendum.
In support of its motion, the City relies upon the election
history since 1987 and its analysis of the election returns
through the special February 2004 election[2].

   Because the court finds that the City did not delay
unreasonably in waiting to file its motion on December 4, 2004,
and that the Plaintiffs have suffered no undue prejudice, the
court will consider whether relief from the judgment should be
granted and whether the proposed modification is suitably
tailored to any changed circumstances. Any modification must
comply with the provisions of the Voting Rights Act.

_____

   [2]As the City points out in its brief, a motion seeking
relief from the 1987 consent judgment might well be timely at any
point at which it could be reasonably argued that there was a
significant change in circumstances which makes it no longer
equitable that the judgment have prospective application.

II.

Section 2(a) of the Voting Rights Act of 1965 prohibits a
State or its political subdivisions from imposing any voting
practice "in a manner which results in a denial or abridgement of
the right of any citizen of the United States to vote on account
of race or color." 42 U.S.C. § 1973(a) (1994). Section 2(b) of
the Act, as amended in 1982, further provides that a violation of
Section 2(a) occurs

> if, based on the totality of circumstances, it is shown
> that the political processes leading to nomination or
> election in the State or political subdivision are not
> equally open to participation by members of a class of
> citizens protected by subsection (a) of this section in
> that its members have less opportunity than other
> members of the electorate to participate in the
> political process and to elect representatives of their
> choice.

42 U.S.C. § 1973(b) (1994).

In Thornburg v. Gingles, 478 U.S. 30 (1986), the Supreme
Court interpreted the amended Voting Rights Act as it applied to
a challenge to multi-member districts in which candidates were
elected at large. Rejecting the claim that an at-large election
scheme is per se violative of the Voting Rights Act, the Court
established three pre-conditions to proving that such a voting
method dilutes minority group voting strength sufficiently to
violate the Act: first, the minority group must be able to
demonstrate that it is sufficiently large and geographically
compact to constitute a majority in a single-member district;
second, the minority group must be able to show that it is
politically cohesive; and third, the minority group must be able

15

to demonstrate that the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. <u>Id</u>. at 50-51. If these pre-conditions are met, a court must then determine under the "totality of the circumstances" whether there has been a violation of Section 2. 42 U.S.C. § 1973(b); <u>Lewis v. Alamance County, NC</u>, 99 F.3d 600, 604 (4th Cir. 1996).

The 1987 consent judgment, as a remedy for the finding that minority voters in the City of Thomasville had less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice, divided the City into five single-member electoral wards, apportioning the population of each ward so that it contained approximately the same number of people. The geographical distribution of the voters allowed one ward to be drawn which was geographically compact and contained a majority of black registered voters. The judgment also provided that two additional members of the City Council were to be nominated and elected at-large by all the qualified voters of the City, making a total of seven Council members. The creation of a majority-minority ward is an accepted method of remedying Section 2 violations.

The City does not contest that there still exists a minority group within the City which is sufficiently large and geographically compact to constitute a majority in a single-member district, nor that the minority group is

politically cohesive.  Nor does the City contest that there is still significant racially polarized voting in Council elections. The City does contest, however, the remaining portion of the third <u>Gingles</u> pre-condition, <u>i.e.</u>, that white majority bloc voting enables it "usually to defeat the minority's preferred candidate." <u>Gingles</u>, 478 U.S. at 51.

A court must have sufficient election data to enable it to determine whether the minority-preferred candidates are usually defeated by white bloc voting.  This election evidence should not be limited to those elections in which a black candidate was on the ballot, and should include a sample of elections large enough to enable the court to determine whether black voters have had success in electing representatives of their choice, whether or not those representatives of choice are themselves of the minority race.  The extent to which members of a protected class have been elected to office is one circumstance to be considered. 42 U.S.C. § 1973(b); <u>Lewis</u>, 99 F.3d at 606-07.  To establish a violation of Section 2, it is not enough to show that white bloc voting defeats the minority-preferred candidates more often than not, nor is proportional representation required.  42 U.S.C. § 1973(b); <u>Lewis</u>, 99 F.3d at 606, n.4.  "[U]nless minority group members experience <u>substantial</u> <u>difficulty</u> electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability 'to elect.'" <u>Gingles</u>, 478 U.S. at 48-49, n.15 (emphasis added).

17

The Plaintiffs' expert, Dr. Orville Burton, analyzed Thomasville City elections from 1987 through 2004 using bivariate ecological regression analysis. This is an accepted method of analyzing the voting preferences of black and white voters and the extent of racially polarized voting. Gingles, 478 U.S. at 53 n.20; but cf. Lewis, 99 F.3d at 604, n. 3. The City does not dispute Dr. Burton's expertise or that his analytical method is the best evidence available of minority and majority voting in the City's elections since 1987.

The critical question in a voting rights case is the ability of minority voters to elect candidates of their choice. Gingles, 478 U.S. at 49, 56. The violation of Section 2 of the Voting Rights Act found in the judgment entered in this case in 1987 was based on the long-standing inability of black voters in Thomasville to elect their candidates of choice under the at-large method of election then in effect. Elections for the two at-large seats since 1987 are the best indicators of whether the ability of African Americans to elect candidates of their choice has changed since 1987, and whether polarized voting today prevents black voters from electing candidates of their choice. The elections for the two at-large seats are also the best indicators of whether a change to an all-at-large election method, with each seat open at the same time for a two-year term, as approved by the City in the 2003 referendum, would be a method suitably tailored to the changed circumstances which would not

18

prevent black voters from having an equal opportunity to elect
candidates of their choice.

Dr. Burton analyzed each at-large election from 1987 through
2004, except the 1995 election for which the necessary data was
not available, to determine which candidates were the candidates
of choice of black voters.  Because two seats were up in each
at-large election Dr. Burton had to determine whether there were
two candidates of choice of black voters or whether only one
candidate had that level of support.  In doing so, Dr. Burton
considered whether the candidate second-most favored by black
voters had at least two-third's of the support of the most
favored candidate.  If the second candidate had that level of
support, he or she would be considered a second candidate of
choice, but if the support was below that level the candidate
would not be considered a candidate of choice.  An independent
review of the election data supports Dr. Burton's findings.[3]

---

[3]Dr. Burton recognized that there may not be unanimity among
experts as to the level of support received by second and third
choices in multi-seat elections to be deemed a preferred
candidate, and also that a candidate could be a candidate of
choice even if he or she did not get the support of a majority of
black voters in a multi-seat election.  To determine who was a
candidate of choice of black voters for the second of the two
at-large seats, Dr. Burton applied a "two-thirds rule"--if the
second-most-favored candidate of black voters had at least
two-thirds of the support of the most favored candidate, that
second candidate would also be deemed a candidate of choice.  A
review of the charts and tables showing Dr. Burton's analysis
supports his use of the two-thirds rule as a reasonable method to
identify a second candidate of choice, if any.  It does appear,
however, from the 1999 election data that Dr. Burton could have
treated candidate Rampp, who finished in a virtual second-place
tie with candidate Bennett, also as a black-preferred candidate.
(Dep. of Dr. Orville Vernon Burton at 22-29, 60; Ex. 2,
(continued...)

Several significant facts stand out as the result of
Dr. Burton's analysis, regardless of any gloss put upon them by
the parties.  In the at-large elections in which a candidate or
candidates of choice of black voters could be determined, the
candidates of choice of black voters won eight of thirteen times.
When the candidate of choice of black voters was black, the
candidate won three of eight times.  When a second candidate of
choice was identified using the 2/3 rule, that candidate won in
four of five elections.  In four of the eight elections every
candidate of choice of black voters was elected--the only
candidate of choice in 1989, both candidates of choice in 1993,
and the only candidate of choice in 1997 and 2001.  These
undisputed facts seem to indicate that the use of at-large
elections does not usually result in the defeat of the candidates
of choice of black voters.  While racially polarized voting
remains, it does not appear that it has been so significant as to
prevent black voters from being able to elect candidates of their
choice to at-large seats.  Racially polarized voting is not
legally significant unless the white bloc vote will normally
defeat the combined strength of black voters plus white
cross-over voters.  <u>Gingles</u>, 478 U.S. at 56.

The court has considered a sufficient number of elections to
enable it to determine whether white bloc voting usually operates
to defeat minority-preferred candidates.  The court has examined

---

[3](...continued)
Table 11e, Apr. 20, 2005; Supplemental Decl. at 15-16, May 13,
2005).  <u>See</u> <u>generally</u> <u>Lewis</u>, 99 F.3d at 612-13 & n.10.

not only those elections in which minority candidates ran, but
every election since 1987 in which data was available[4]. Nor has
the court looked at the question as simply how many blacks versus
whites were elected; the court has examined the evidence of
voting preferences to determine who were the preferred candidates
of the majority and minority communities (facts which the parties
do not dispute). Although the court does not believe that the
third <u>Gingles</u> factor has been satisfied, the court has still, as
directed by <u>Gingles</u>, made "a searching practical evaluation of
the past and present reality," mindful that the ultimate inquiry
is to determine under the totality of the circumstances whether
the City's proposed change to the election scheme will have the
effect of diluting minority voting strength so that
minority-preferred candidates will be systematically defeated by
white-bloc voting. <u>See</u> <u>United States v. Charleston County</u> 365
F.3d 341 (4th Cir.), <u>cert</u>. <u>denied</u>, _____ U.S. _____, 125 S. Ct.
606 (2004) (satisfying the three <u>Gingles</u> preconditions is not

_____

[4]While black-white exogenous elections may have some limited
evidentiary value as to the presence of racially polarized voting
(a fact the City admits), the Plaintiffs' expert study of the
1990 and 1996 U.S. Senate races between an incumbent white
Republican, Jesse Helms, and a black challenger running on the
Democratic ticket, Harvey Gantt, adds little to the court's
analysis. There were likely no more polarized races in the
country than the two between Helms and Gantt, the Republican
"arch conservative" and the Democratic "progressive," as
described by the media. Indeed, Dr. Burton's analysis shows that
100% of black voters voted for Gantt and 73.4% of white voters
voted for Helms. The 2004 race for state auditor between black
and white candidates running on partisan tickets is also of
limited value, with substantially the same percentages of black
and white voters voting for the respective candidates (75% of
whites voted for the white Republican; 100% of blacks voted for
the black Democrat).

21

enough; a plaintiff must show that under the totality of the circumstances the electoral scheme violates Section 2).

Even assuming the three *Gingles* pre-conditions have been met, a comprehensive examination of the totality of the circumstances does not indicate that the City's proposed at-large election scheme would be violative of Section 2. The election method approved by the voters in the 2003 referendum is an altogether different method from the one the court found unlawful in 1987. Black voters' ability to elect candidates is enhanced by the increased number of seats and the elimination of staggered terms and residency districts so that the candidates for all seven seats run together in a non-partisan, plurality election, allowing the use of single-shot voting.

Candidates running in the proposed at-large scheme would not have to survive primaries or run-offs, and would not have political party affiliations. Consideration of these factors, which have been obstacles in other cases, are therefore not relevant here. Thus the cost of campaigning is less than it would be if candidates had to run in primaries as well as the general election, with the possibility of run-offs. Although campaign costs can be significant under any circumstances, Thomasville's relatively small size makes the cost of appealing to the individual voters less than it would be in larger cities, thus limiting any economic disadvantage of minority candidates. Although Plaintiffs contend that annexation has diluted the

African American proportion of the electorate,[5] there is no
evidence that annexation has been used by the Defendants for a
discriminatory purpose. Section 2 as amended makes it clear that
a violation can be proven by showing a discriminatory effect
alone, but the lack of evidence of intent may be relevant in
conducting the searching inquiry required by Gingles.[6]

The court has also examined the facts surrounding black
voters' sustained success in electing candidates of their choice
since 1987 to see if any special circumstances warrant
discounting such apparent success. Plaintiffs have submitted
affidavits by two individuals, both members of the NAACP, who
reside or have resided in Thomasville and who aver that they are
aware of certain circumstances surrounding City Council elections
in Thomasville since 1987. (Decl. of Eddie L. White, March 18,
2005; Decl. of George Jackson, March 21, 2005). Both individuals
attribute the success of black candidates of choice to the

---

[5] Plaintiffs' evidence indicates a significant increase in
population from 1987 to 2004. Plaintiffs' expert concludes that
annexation has diluted the black proportion of the electorate to
less than 20% in 2004. However, Plaintiffs' proposed findings of
fact indicate 21.75% of registered voters were black in 2004,
1.70% higher than the City's evidence shows. Plaintiffs'
evidence also shows that 22.28% of the voting age population was
black in 2000, according to the 2000 census. While the black
proportion of the population of the City has decreased since
1987, it does not appear that the decrease is as dramatic as
Plaintiffs contend.

[6] The Senate Report accompanying the amended Section 2
recognized the probative value of voting practices or procedures
intentionally adopted to enhance the opportunities for
discrimination against a minority group (unusually large election
districts, majority vote requirements, anti-single-shot
provisions, candidate slating processes, voting qualifications,
and prerequisites to voting). S. Rep at 28-29.

23

cross-over support of white voters. Both affiants also state
that the African American community's black candidate of choice
in 1997, Margaret Hammond, was not re-elected in 1999 because her
support of the police chief, who was unpopular in the African
American community, lost her the support of black voters. If
true, then Hammond's loss in 1999 would not be evidence that
black voters were unable to elect candidates of their choice.
Nevertheless, Plaintiffs' expert, Dr. Burton, identified Ms.
Hammond as the black voters' candidate of choice in both 1997 and
1999.

Plaintiffs have also argued that the successful 2003
referendum is further evidence of voter dilution in that black
voters were unanimous in their opposition to all three questions
on the referendum. The referendum passed narrowly by 125 votes.
Only 950 black voters went to the polls to vote on the
referendum. One of Plaintiffs' affiants, George Jackson, wrote a
position statement in opposition to the referendum proposals.
Jackson attributes the proposals' passage to the failure of black
voters to go to the polls because they believed that the
proposals were not going to pass anyway.

As noted, the opinions stated in the affidavits of George
Jackson and Eddie L. White attribute the successful runs of black
candidates for at-large seats on the City Council to cross-over
voting by the white community. Plaintiffs' expert, Dr. Burton,
attributes the black candidate's 1987 success to the "warming
effect" following the adoption of the 1987 voting scheme when

24

more blacks registered and turned out to vote because they believed they had a real opportunity to elect candidates of their choice after a century of exclusion from political participation. Plaintiffs also contend that on two of the three occasions when the black candidate lost prior to 2004 that candidate did not have the full support of the black community. If true, then Plaintiffs have no basis to contend that they have been unable to elect their black candidates of choice based on those two elections. Also, Eddie L. White's declaration states that the two black candidates who won did not have the support of the black community. These contentions are contrary to Dr. Burton's expert report.

Plaintiffs' suggestion that the 1987 success of a black candidate for an at-large seat should be discounted because black voters "excitedly believed that they might have a real opportunity to elect candidates of their choice after over a century of exclusion from political participation," Expert Report of Orville Vernon Burton, Apr. 11, 2005, p. 12 n.6, is questionable. The purpose of the 1987 judgment was to give minority voters an opportunity to participate fully in the political process, and increased registration and participation in the elections was something to be expected and encouraged. To discount black voters' and black candidates' success because of increased participation appears unwarranted. If participation breeds success, then success should breed more participation. The fact that black voters' sustained success in electing

candidates of their choice is in large part dependent on
registration and turnout is no different from the necessity for
any interest group to mobilize their supporters to support their
issues. Even so, black voters were still able to elect a black
candidate of their choice ten years after the allegedly initial
warming effect, despite voter turnout in 1997 of 16% less than in
1987.[7] Furthermore, attracting white cross-over voters, which
Plaintiffs condemn, would also seem to be something to be
encouraged. "[M]inority voters are not immune from the
obligation to pull, haul, and trade to find common political
ground, the virtue of which is not to be slighted in applying a
statute meant to hasten the waning of racism in American
politics." Johnson v. DeGrandy, 512 U.S. 997, 1020 (1994).

The failure of two black candidates to be elected to the two
at-large seats in the 2004 special election, cited by the
Plaintiffs as evidence of the need for the present election
scheme, was due in part, according to the affidavit of George
Jackson, to the fact that two black candidates ran which caused
the vote of African Americans to be divided between the two
candidates. (Jackson Decl. ¶ 10, at p.3.) While this may be
true, Dr. Burton still found both black candidates to be the
candidates of choice for black voters. Regardless, the special

---

[7]Davidson County Election Board records show that in 1987
40.3% of registered voters turned out to vote; in 1997 voter
turnout was 24.3%. Records also show that in 1989, just two
years after the adoption of the new voting scheme, voter turnout
was down to 30%, yet black voters were still able to elect a
black candidate of their choice.

circumstances of the February 2004 election, postponed from November 2003 because of this litigation, make it atypical. Only 21.37% of registered voters turned out to vote, the smallest percentage since the 1987 decree. The election results in the decade and a half following the 1987 consent decree and black voters' sustained success in electing candidates of their choice provides a more meaningful picture of voting opportunities in Thomasville than a single election conducted under special circumstances.

Based on evidence submitted by Plaintiffs and Defendants, the court has engaged in a "searching practical evaluation," Gingles, 478 U.S. at 45, of electoral conditions in Thomasville, and reaches the following:

CONCLUSIONS OF LAW

1. Defendants' motion pursuant to Rule 60(b)(5) seeking relief from the March 18, 1987, consent judgment is timely and the Plaintiffs have not been unfairly prejudiced by any delay.

2. The consent judgment entered in this case in 1987 is properly considered an institutional reform decree under the standards of Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367 (1992), and the City has the burden of establishing that a significant change in facts or law warrant revision of the decree or that enforcement of the decree would be detrimental to the public interest.

27

3.  The consent judgment entered in this case in 1987 was intended to be remedial in nature and it is in the public interest to return control over elections to local authorities unless doing so would interfere with the voting rights of minority citizens as protected by the Voting Rights Act.

4.  When modification of a consent decree is warranted the court must determine whether any proposed modification is suitably tailored to the changed circumstances.

5.  Any modification of a judgment prohibiting voting practices which previously resulted in a denial or abridgment of the rights of citizens to vote on account of race or color must comply with the provisions of the Voting Rights Act of 1965, as amended, 42 U.S.C. §§ 1971, 1973et seq.

6.  The court has examined sufficient voting data from eight elections from 1987 to 2004 to enable the court to determine whether black voters have had success in electing representatives of their choice to the City Council.

7.  The ultimate question in a voter-dilution case is whether minority voters are able to elect their candidates of choice, whatever the candidate's race.

8.  The extent to which minority group members have been elected to public office is an important factor in determining whether under the totality of the circumstances an at-large voting system dilutes minority voting strength in violation of Section 2 of the Voting Rights Act.

9.  Elections for the two at-large seats on the City Council provide the best available evidence as to whether the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidates.

10.  Bivariate ecological regression analysis in which the voting preferences of black and white voters are determined when two seats are available in each election, and applying the rule that a second-most favored candidate of choice of black voters is one who had at least 2/3 of the support of the most-favored candidate, is an accepted method of analyzing black voters' preferences.

11.  Racially polarized voting exists in the City of Thomasville, but it is not so significant that bloc voting by the white majority enables it usually to defeat the minority's preferred candidates.

12.  Black voters' success in electing candidates of choice on eight of thirteen occasions, and electing a black candidate of choice on three of eight occasions, and electing every candidate of choice in four of eight elections, indicates that bloc voting by the white majority does not usually defeat black voters' candidates of choice.

13.  The fact that support from white voters has been needed for black voters to elect candidates of their choice does not mean that black voters have been unable to elect candidates of their choice or that minority voting strength is diluted.

14.   Defendants have established that a significant change in the facts and circumstances surrounding black voters' ability to elect candidates of their choice has occurred since the consent judgment in this case in 1987 which warrants consideration of whether the judgment should continue to have prospective application.

15.   Because a political subdivision released from an injunction imposing a remedial election plan must still comply with the requirements of the Voting Rights Act, the court must evaluate any new election scheme before granting relief from the prior judgment.

16.   An election method in which all seven seats for the City Council are elected at the same time in a non-partisan plurality election, with the elimination of staggered terms and residency districts, has significantly fewer barriers than the at-large election method before the court in 1987, is suitably tailored to the changed circumstances since the 1987 judgment, and does not have a significant likelihood of diluting minority voting strength in violation of Section 2 of the Voting Rights Act.

17.   The 1987 judgment in this case has served its remedial purpose and it is no longer equitable that it should have prospective application.

18.   The March 18, 1987, judgment entered in this case should be dissolved subject to the implementation of the voting

method approved in the 2003 referendum for the 2007 municipal election.

CONCLUSION

Because elections for the two at-large seats on the City Council are indicative of the political opportunities for black voters since 1987, the court has analyzed past election results for the two seats. Black voters sustained success in electing candidates of their choice to the two at-large seats, along with the other factors set out, indicate a significant change in the facts and circumstances since 1987 warranting vacation of the 1987 consent judgment and also indicate that the proposed election method will not likely deprive black voters of the political opportunity they have experienced under the existing system. With seven seats available in each biennial plurality election, and the availability of single-shot voting, black voters should be able to duplicate or even exceed the success that they have had under the current method. Therefore, the court will vacate the judgment entered in this case on March 18, 1987, and allow the 2007 elections for seats on the Thomasville City Council to be conducted utilizing the election method approved by the voters in the April 15, 2003, referendum.[8]

---

[8]The length of the terms of any City Council members elected in November 2005 is not an issue before the court at this time. The court cannot enter an order as suggested in the City's proposed conclusions of law without giving those potentially

(continued...)

An order and judgment in accordance with these Findings of
Fact and Conclusions of Law shall be entered contemporaneously
herewith.

United States District Judge

November 23, 2005

---

[8](...continued)
affected by any term limitation an opportunity to be heard.